IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIAM BLAINE MAYFIELD,

      Petitioner,             No. CIV S-04-1182 RRB DAD P

   vs.

TOM CAREY, Warden, et al.,

      Respondents.      FINDINGS & RECOMMENDATIONS

_____/

      Petitioner is a state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges former California Governor Gray Davis's reversal of the April 2, 2002 decision by the Board of Parole Hearings (hereinafter Board) finding petitioner suitable for parole.  He claims that the Governor's action violated his right to due process.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

PROCEDURAL AND FACTUAL BACKGROUND

      In 1985, after a jury trial, petitioner was convicted of second degree murder.  (Answer, Ex. A.)  On December 20, 1985, he was sentenced in the Mendocino County Superior Court to seventeen years to life in state prison.  (Id.)  Petitioner entered the California

1

Department of Corrections on December 27, 1985 to begin serving his term and became eligible

for release on parole on February 19, 1996.  (Memorandum of Points and Authorities attached to

Petition (hereinafter P&A) at 1, 8.)

The circumstances of petitioner's offense of conviction were described at

petitioner's April 2, 2002 parole suitability hearing, as follows:

> PRESIDING COMMISSIONER MOORE:  Now, Mr. Mayfield, we've gotten through the preliminaries here.  Let's see, you had been having some troubles or some problems with your estranged wife.  However, you were still maintaining some sort of a relationship and your wife was living in your brother's trailer and she was dating other men.  Is that accurate so far?
>
> INMATE MAYFIELD:  Yes, sir.
>
> PRESIDING COMMISSIONER MOORE:  And let's see, apparently you had had some type of fight or argument with her where you had punched her and you had taken the tires from her car during this period.  You also got into a fight with another of her boyfriends.  And let's see, in the night in question, you went to the trailer where she was staying and you saw the truck of her current boyfriend, the victim, Mark Snyder.  You rammed his truck several times, then you, you went home, you left.  You returned with a gun, a revolver.  And at that point, apparently you let out the air in the tires on the truck.  And then you went to the window, to the house at around 3:30 a.m. or 4:00 a.m., somewhere in that time frame.  You went to the bedroom and found the victim and your wife in the bedroom sleeping.  The victim had a gun and then you shot the victim.  Is that accurate?
>
> INMATE MAYFIELD:  Basically, yes, sir.
>
> PRESIDING COMMISSIONER MOORE:  Also, your blood alcohol level was measured at .25 percent.  Is that accurate as well?
>
> INMATE MAYFIELD:  Yes, sir.

(Answer, Ex. B at 16-17.)

On June 14, 1995, petitioner appeared before the Board for his initial parole

consideration hearing.  (P&A at 1.)  Petitioner was found unsuitable for parole at that hearing.

(Id.)  On July 28, 1998, petitioner appeared before the Board for his second parole consideration

/////

2

1  hearing.  (Id.)  Petitioner was again found unsuitable for parole and was denied parole

2  consideration for three years.  (Id.)

3  Petitioner filed a petition for writ of habeas corpus in the Mendocino County

4  Superior Court challenging the Board's decision finding him unsuitable for parole at the 1998

5  hearing.  (Id.)  In a July 14, 2000 decision, the Superior Court granted the petition, finding that

6  the Board abused its discretion and violated petitioner's due process rights when it found him

7  unsuitable for parole at the 1998 hearing.  (Pet., Ex. 10.)  The Superior Court ordered the Board

8  to hold another parole hearing, but declined to "set a parole date or retain any kind of jurisdiction

9  over this case."  (Id.)

10  On October 25, 2000, the Board conducted a parole consideration hearing,

11  pursuant to the July 14, 2000 order of the Mendocino County Superior Court.  (Pet., Ex. 1 at 2.)

12  The Board again found petitioner unsuitable for parole.  (Id.)  Petitioner challenged the Board's

13  October 25, 2000 decision in a petition for writ of habeas corpus filed in the Mendocino County

14  Superior Court.  (Id.)  By order dated December 21, 2001, the Superior Court granted this

15  petition, finding that the Board's decision at the October 25, 2000 hearing was "arbitrary and

16  capricious" and a violation of petitioner's "substantive procedural and due process rights."  (Id. at

17  13-14.)  The Superior Court concluded that: (1) petitioner's crime of conviction was "probably" a

18  "crime of passion" motivated by jealousy over his pregnant estranged wife's boyfriends, which

19  may have prompted the jury to convict petitioner of voluntary manslaughter if it had been

20  allowed to consider this issue; (2) the Board improperly based its decision primarily on the

21  gravity of petitioner's commitment offense; (3) the Board erroneously concluded the crime was

22  "brutal" and unprovoked; (4) petitioner had an exemplary prison record and had not consumed

23  drugs or alcohol while in prison; (5) all of petitioner's violent behavior stemmed from jealousy

24  over his estranged wife's boyfriends; (6) statutory circumstances tending to show unsuitability

25  for parole were not applicable to petitioner, whereas statutory circumstances tending to show

26  suitability for parole were applicable; (7) petitioner had no juvenile record and, with the

3

exception of his estranged wife, had stable social relationships; (8) petitioner surrendered to the

police and showed signs of remorse; (9) petitioner committed his crime while under stress; (10)

petitioner's present age reduced the probability of recidivism; (11) petitioner had realistic plans

for release; (12) petitioner's psychological evaluations were positive; and (13) petitioner's

actions while in prison made him "a poster-boy for prison rehabilitation."  (Id. at 2-13.) The

Superior Court ordered the Board to conduct a new parole hearing "forthwith, at which it is to

find Petitioner suitable for parole pursuant to this opinion and to set a parole date for Petitioner."

(Id. at 14.)  The court retained jurisdiction over the matter "to enforce its order with appropriate

proceedings as to individual members or the board as a whole if necessary."  (Id.)

In accordance with the Superior Court's December 21, 2001 decision, the Board

held another parole consideration hearing for petitioner on April 2, 2002. (Pet., Ex. 4.)  At this

hearing, the Board found petitioner suitable for parole, relying on some of the factors in favor of

suitability enunciated by the Superior Court in its December 21, 2001 order.  (Id. at 114-17.)  At

the conclusion of its remarks, a Board member stated, "Mr. Mayfield, the court has taken us out

of the equation here and has no desire to understand or to hear from us." (Id. at 117.)

On August 30, 2002, then-Governor Gray Davis found petitioner unsuitable for

parole and reversed the Board's April 2, 2002 decision.  (Pet., Ex. 2.)  In his decision, the former

Governor disagreed with many of the findings and conclusions expressed in the California

Superior Court's December 21, 2001 decision, and made his own findings from the record.  (Id.

at consecutive pgs. 3-7.)  The Governor described petitioner's crime of conviction and

subsequent proceedings as follows:

> William Mayfield had been drinking when his roommate, David
> Telemchuk, arrived home around midnight on March 11, 1985.
> They finished a half-pint of whiskey together and decided to drive
> to the liquor store just before 2:00 a.m.  After purchasing more
> whiskey, Mr. Mayfield drove approximately 10 miles south to
> Redwood Valley to the trailer home in which his estranged wife,
> Bridgett Mayfield, resided.  Mr. Telemchuk argued vehemently
> with Mr. Mayfield, trying to convince him to turn back.  Mr.
> Mayfield refused.

4

When they arrived, they discovered Mark Snyder's truck in the driveway.  Mr. Snyder had been dating Ms. Mayfield while she was in the process of divorcing Mr. Mayfield.  Despite Mr. Telemchuk's continued pleas to leave, Mr. Mayfield backed his truck into Mr. Snyder's truck twice.  He then drove back towards Willits by an indirect route that took approximately 45 minutes, which he later admitted allowed him time to "cool off."

Once home, Mr. Telemchuk went to sleep on the couch.  Mr. Mayfield loaded his .357 Smith and Wesson pistol and drove back to his wife's trailer.

After he arrived, he let the air out of two tires on Mr. Snyder's truck.  He then tried to open the trailer's front bedroom window.  When he could not open it, he decided to try the living room window.  He moved a propane tank beneath the window, and while balancing on the tank, removed the entire glass panel.  He set the window inside the trailer and climbed into the living room.

After rummaging through the front bedroom and looking through pictures for 10 to 15 minutes, Mr. Mayfield walked toward the master bedroom where Ms. Mayfield and Mr. Snyder were sleeping.  When Mr. Mayfield entered the room, either he or Mr. Snyder said, "Hey."  Mr. Mayfield immediately jumped on Mr. Snyder, who managed to kick Mr. Mayfield off the bed to the floor.  Mr. Mayfield stood up, drew his pistol from his waistband and said, "How would you like to get shot?"  He then fired a bullet through Mr. Snyder's throat.  While Mr. Snyder gurgled and gasped for air, Mr. Mayfield fled through the living room sliding glass door.  The coroner concluded that Mr. Snyder died 15 to 30 minutes later.

Mr. Mayfield returned home, woke his roommate, and asked for a ride to the Willits Railway Station.  When they discovered that the train station was closed, they decided to go to a mutual friend's house.  That friend ultimately persuaded Mr. Mayfield to contact the police.  Mr. Mayfield's blood-alcohol level measured .25 percent several hours after the crime.

\* \* \*

In 1998 the Board of Prison Terms found Mr. Mayfield unsuitable for parole.  The Board reasoned that Mr. Mayfield carried out the offense in a callous and dispassionate manner, with a disregard for Mr. Snyder's life and suffering.  The Board also based its determination on Mr. Mayfield's history of substance abuse, two driving under the influence charges, and failure to participate in sufficient self-help and therapy programs while incarcerated.  The Board noted that Mr. Mayfield committed several criminal acts before the life offense for which he never was charged.  For instance, he broke into the [sic] Mr. Snyder's garage and stole Ms.

1    Mayfield's tires, and a few days before the life offense, broke into
     Ms. Mayfield's home and assaulted another of her male friends.
2

3  (Id. at 2-3.)

4         The Governor found that a "review of the relevant factors" demonstrated

5  petitioner was unsuitable for parole.  (Id. at 4.)  The Governor explained his reasoning as follows:

6         After thoroughly reviewing the record and carefully considering
          the court's opinions, I respectfully disagree.  Based on my own
7         evaluation of the factors in 15 California Code of Regulations
          ("CCR") section 2402, I find Mr. Mayfield unsuitable for parole.
8         Indeed, I believe the court made several errors in rejecting the
          Board's October 2000 assessment of Mr. Mayfield.  A review of
9         the relevant factors confirms that he is not ready for release.

10        The October 2000 hearing panel deemed Mr. Mayfield's offense a
          "brutal and unprovoked attack on a vulnerable victim."  The court
11        found this an improper characterization.  The court reasoned that
          the panel's characterization suggests premeditation and
12        deliberation, findings the court concluded the jury "may have"
          rejected.  The court specifically disagreed with the Board's use of
13        the word "cruelty," finding "there was no cruelty involved in the
          killing, which consisted of a single shot to the victim."  The court
14        also disputed that the offense was "unprovoked," stating "it
          involved [Mr. Mayfield's] estranged yet pregnant wife being in bed
15        with her then current boyfriend."  I disagree entirely.

16        As an initial matter, I do not agree that the Board's characterization
          necessarily suggests premeditation and deliberation.  Nevertheless,
17        the evidence speaks for itself.  In the months before the killing, Mr.
          Mayfield told his roommate he planned to "get Mark."  Then, on
18        the night of the life offense, Mr. Mayfield had many opportunities
          to cease, but continued.  He drove to Ms. Mayfield's trailer amid
19        his roommate's vehement objections.  After crashing into Mr.
          Snyder's car twice, he drove a circuitous route home, which he
20        admitted allowed him time to "cool off."  Yet, when he arrived
          home, he armed himself and drove 10 miles back to the trailer in
21        the middle of the night.  In my opinion, these actions suggest
          thought and decision-making, not blind rage.
22
          Moreover, I agree with the Board that Mr. Mayfield's crime was a
23        brutal and unprovoked attack on a vulnerable victim.  Mr. Mayfield
          crawled quietly into the trailer in the darkness, entered the
24        bedroom, and shot Mr. Snyder in the throat before Mr. Snyder
          could defend himself.  According to the coroner, Mr. Snyder died
25        between 15 to 30 minutes after the shooting.  I find Mr. Mayfield's
          actions, and Mr. Snyder's death, brutal.  As for provocation, no
26        evidence in my possession corroborates that Ms. Mayfield was

pregnant with Mr. Mayfield's child, nor even that she told him any such thing. Indeed, Mr. Mayfield signed an agreement to dissolve his marriage and knew Ms. Mayfield was dating other men. Yet, he essentially continued to stalk Ms. Mayfield and beat up anyone he caught dating her. Mr. Mayfield's crime is unjustifiable – any effort to argue that his crime was provoked is to pin blame unjustly on an innocent victim and allow Mr. Mayfield to escape the absolute responsibility he rightfully bears.

The October 2000 hearing panel found Mr. Mayfield unsuitable based also on his escalating pattern of violence preceding the murder and history of substance abuse. The court disagreed, finding that all of Mr. Mayfield's preceding violence stemmed from jealousy over his estranged wife's boyfriends and that he has not used alcohol or drugs since incarceration.

In fact, Mr. Mayfield's acts of violence did not all stem from jealousy relating to Ms. Mayfield. Mr. Mayfield assaulted his ex-girlfriend in 1993 when she tried to leave him. He brandished a loaded gun at his roommate during an argument just days before the life offense. This violence does not appear to have anything to do with Ms. Mayfield.

Further, while Mr. Mayfield may have abstained from drugs and alcohol while incarcerated, he has not faced the same pressures in prison that he will face in society. I note that, after abstaining from alcohol for approximately a year following a rehabilitation program in 1984, Mr. Mayfield turned to alcohol just before committing the life offense. He did so in reaction to anger and jealousy stemming from a failed romantic relationship. These are common emotions that he likely will experience with future romantic partners. He ignored the lessons learned in his rehabilitation program then, and I am not convinced that when faced with similar stress, he will remain committed to the lessons learned in alcohol and drug programs during incarceration. It simply is too soon to conclude with confidence that Mr. Mayfield will resist reentering the pattern of substance abuse and violence that lead to Mr. Snyder's murder.

The court cited the factors listed in 15 CCR section 2402(c) that tend to show unsuitability for parole and concluded that none of them apply in Mr. Mayfield's case. I believe the court's reasoning is wrong in several respects.

First, the court found that Mr. Mayfield's crime did not involve multiple victims. I disagree. Just days before the incident, Mr. Mayfield broke into Ms. Mayfield's home, and after beating her male friend, attacked Ms. Mayfield. On the night of the life offense, in a strikingly similar manner, Mr. Mayfield broke into his estranged wife's home and attacked her boyfriend. Ms. Mayfield likely feared for her life that night, expecting him to attack her next. Whether or not Mr. Mayfield pointed the gun at his wife, he

7

victimized her nonetheless.  Thus, I believe Mr. Mayfield's crime did involve multiple victims.

Second, the court found the murder was not committed execution-style.  However, that [sic] the relevant factor is whether the offense was carried out in a dispassionate and calculated manner.  (15 CCR section 2402(c)(1)(B).)  Execution-style murder merely is an example of such an offense.  (Id.)  Here, Mr. Mayfield's crime certainly was dispassionate and calculated.  As discussed above, he had many opportunities to cease, but chose to continue.  And when he finally broke into Ms. Mayfield's home, he did not head straight for Mr. Snyder.  Rather he walked to the vacant bedroom and looked through Ms. Mayfield's pictures.  In my estimation, this was not a man dizzy with jealousy and rage.  It was a man who, by his own statements, was out to "get Mark" and did so.

Third, the court concluded that Mr. Mayfield did not act with exceptionally callous disregard for human suffering because, according to the court, "as soon as the victim awoke [Mr. Mayfield] fired the fatal shot, which appears to have killed [Mr. Snyder] instantly."  The court is mistaken.  By Mr. Mayfield's own admission, he did not shoot as soon as Mr. Snyder awoke.  Rather, he jumped on Mr. Snyder and they struggled until Mr. Snyder was able to push Mr. Mayfield away.  Then, Mr. Mayfield stood up, drew his weapon, said "How would you like to get shot," and fired.  Furthermore, Mr. Snyder did not die "instantly."  According to the coroner, Mr. Snyder died 15 to 30 minutes after the fatal shot.

Fourth, the court found that Mr. Mayfield does not appear to have had tumultuous relationships other than with his estranged wife.  That neglects the fact that Mr. Mayfield attacked his previous girlfriend and threatened his roommate with a loaded pistol.  I deem these actions signs of tumultuous relationships other than with his estranged wife.

Finally, the court ignored the previous record of violence criteria contained in 15 CCR section 2402(c)(2).  As discussed above, Mr. Mayfield engaged in a pattern of violence before the life offense, both against women with whom he was involved romantically and against men.  All of these criteria argue against Mr. Mayfield's suitability for parole.

The court then cited the factors listed in 15 CCR section 2402(c) that tend to show suitability for parole and concluded they all apply to Mr. Mayfield.  I find otherwise.

While it is true that Mr. Mayfield has no juvenile criminal record, he admits breaking the law on a relatively regular basis both as a juvenile and an adult.  He began drinking alcohol *illegally* at age 17 and, by age 20, drank heavily and regularly.  He also started using illicit drugs habitually as a juvenile.  As an adult, he was

arrested twice for driving under the influence, yet continued drinking.  He later avoided prosecution for assaulting his wife by attending an alcohol detoxification program in 1984, though I note, he continued using illegal drugs even after attending the program.  Then, on the night of the life offense, he drove many miles back and forth to his estranged wife's home while intoxicated.  Hours after the murder his blood-alcohol level measured 0.25 percent – more than three times over the legal limit.  Additionally, he broke into Mr. Snyder's garage and stole Ms. Mayfield's tires and he assaulted several individuals on various occasions, including an ex-girlfriend, Mr. Mayfield and two of her boyfriends, and Mr. Telemchuk.  That Mr. Mayfield lacks a significant criminal record seems only by his luck or evasiveness.

Also, while I agree that Mr. Mayfield has expressed remorse for his crime, I question his sincerity.  Mr. Mayfield attempts to diminish his culpability by asserting a version of the life offense that diverges from witness accounts in important ways.  While Mr. Telemchuk told police that he removed the bullets from Mr. Mayfield's gun after Mr. Mayfield threatened him with it, Mr. Mayfield maintains that the gun was loaded when he picked it up to take with him to confront Mr. Snyder.  Mr. Mayfield also claims he knocked on the trailer door before entering through the window, suggesting that he entered believing no one was home.  More recently, Mr. Mayfield acknowledged that he "had a strong likelihood to know" Mr. Snyder was in the trailer given that his truck was parked in the driveway.  He continues, however, to assert that he knocked on the door.  Most importantly, he claims that Mr. Snyder pointed a gun at him before he fired at Mr. Snyder.  The record is unclear as to whether this is true; nevertheless, Mr. Mayfield must realize that he had no right to kill Mr. Snyder.  Indeed, knowing that Mr. Snyder regularly carried a gun because he recently had been attacked, Mr. Mayfield deliberately placed himself in a position that likely would result in a gun battle.  Mr. Snyder's attempt to diminish his culpability suggests he is not genuinely remorseful.

Moreover, while Mr. Mayfield has the good fortune of a loving family, the court improperly concluded that he has a stable social history.  As detailed above, Mr. Mayfield's history is rife with unstable and violent relationships.

(Pet., Ex. 2 at consecutive pgs. 4-7.)

The Governor concluded his decision with the following remarks:

Mr. Mayfield has made some commendable efforts while in prison.  He completed the 15 course units necessary to earn his Bachelor of Science Degree.  He participated in several self-help, therapy, and vocational programs, and has managed to remain disciplinary-free

1    throughout his incarceration.  While these factors argue for parole,
     they do not outweigh my concerns that Mr. Mayfield continues to
2    pose an unreasonable threat to society.

3    As a final note, in addition to the factors discussed above, I am
     particularly concerned by Mr. Mayfield's history of violence
4    against women.  Though his psychological evaluations generally
     are favorable, none of them suggest that he has adequately dealt
5    with his propensity for domestic violence.  His record demonstrates
     that when faced with disappointment, jealousy, and stress, he reacts
6    by abusing his romantic partner.  Ms. Mayfield told police in a
     tape-recorded statement following the life offense that she left Mr.
7    Mayfield because she was tired of serving as his "punching bag."
     If released, he undoubtedly would face similar emotions involving
8    women sometime in the future, and I believe it is too soon to
     conclude with confidence that he will be willing or able to control
9    his temper.

10   (Id. at consecutive pgs. 7-8.)

11          Petitioner challenged the Governor's unfavorable decision in a petition for writ of

12   habeas corpus filed in the Mendocino County Superior Court  (Pet., Ex. 3.)  By order dated

13   August 7, 2003, that petition was denied.  (Id.)  The Superior Court explained its reasoning as

14   follows:

15          Due process requires that the Governor give individual
            consideration of the criteria which must be considered by the
16          Board of Prison Terms in determining parole suitability.  State
            regulations list the criteria to be considered as "general guidelines"
17          in making the parole decision.  (Cal. Code of Regulations, tit. 15,
            sec. 2402.)  In the parole context, the requirements of due process
18          are satisfied if some evidence supports the Governor's decision.
            (In re Rosenkrantz (02) 29 Cal.4th 616, 676-677.)
19
            Ascertaining whether this standard is satisfied does not require
20          examination of the entire record, independent assessment of the
            credibility of witnesses, or weighing of the evidence.  Instead, the
21          relevant question is whether there is any evidence in the record that
            could support the conclusion reached by the Governor.  (In re
22          Rosenkrantz, supra, at p. 665.)

23          After review and consideration of the documentation and written
            arguments submitted by counsel, the Court finds the Governor
24          independently considered the general guidelines set forth in
            California Code of Regulations, title 15, section 2402 and his
25          decision finding the petition unsuitable for parole is supported by a
            modicum of reliable evidence.  The petitioner's claim that the
26          Governor has a blanket no-parole policy, as well as his contention

10

1                that the Governor's decision violated ex post facto prohibitions,
2                have been rejected by the California Supreme Court (In re
               Rosenkrantz, supra, 29 Cal.4th at pp. 637-652, 683-686), and this
3                Court is bound by that decision.  (See In re Capistran (03) 107
               C.A.4th 1299.)

4                The petition for habeas corpus relief is denied.

5 (Id.)

6         On December 19, 2003, petitioner challenged the Superior Court's August 7, 2003

7 decision in a petition for a writ of habeas corpus filed in the California Court of Appeal for the

8 First Appellate District.  (P&A at 2.)  That petition was summarily denied.  (Pet., Ex. 8.)

9 Petitioner subsequently filed a petition for writ of habeas corpus in the California Supreme

10 Court, which was summarily denied by order dated May 19, 2004.  (Pet., Ex. 11.)

11         On June 21, 2004, proceeding in pro per, petitioner filed the instant federal

12 petition for a writ of habeas corpus.  On October 5, 2004, respondents filed an answer.  On

13 October 25, 2004, proceeding through counsel, petitioner filed a traverse.

14                                   ANALYSIS

15 I.  Standards of Review Applicable to Habeas Corpus Claims

16         A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

17 some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

18 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

19 Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the

20 interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

21 Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas

22 corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377

23 (1972).

24         This action is governed by the Antiterrorism and Effective Death Penalty Act of

25 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d

26 /////

1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting

habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

The court looks to the last reasoned state court decision as the basis for the state

court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

court reaches a decision on the merits but provides no reasoning to support its conclusion, a

federal habeas court independently reviews the record to determine whether habeas corpus relief

is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

AEDPA's deferential standard does not apply and a federal habeas court must review the claim

de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

1167 (9th Cir. 2002).

II.  Petitioner's Due Process Claim

A.  Description of Claim

Petitioner claims that the Governor's decision reversing the Board's favorable

suitability finding deprived him of his liberty without due process of law.  Petitioner raises

several arguments in support of this claim.  First, he contends that his crime of conviction was

12

1  not "aggravated," as that term is defined in the California Code of Regulations and that therefore,

2  the nature of his commitment offense was not a proper basis upon which the Governor could

3  base his decision that petitioner was unsuitable for parole.  (P&A at 13.)  Petitioner argues that

4  the circumstances of his crime were no more that the "minimum necessary to sustain a conviction

5  for that offense."  (Id. at 14.)  Second, petitioner argues that the Governor failed to consider "the

6  matrix or the proportionality requirement of Penal Code Section 3041(a) and (b)."  (Id. at 16.)  He

7  contends that "in order to provide uniformity in sentencing, those convicted of similar offenses

8  are expected to spend approximately the same amount of time incarcerated."  (Id. at 16-17.)

9           Third, petitioner argues that the Governor improperly considered uncharged and

10  unproven allegations in reaching his decision, in violation of California law.  (Id. at 17-21.)

11  Specifically,  petitioner objects to the following portion of the Governor's decision:

12                Mr. Mayfield committed several criminal acts before the life
                 offense for which he never was charged.  For instance, he broke
13                into Mr. Snyder's garage and stole Ms. Mayfield's tires, and a few
                 days before the life offense, broke into Ms. Mayfield's home and
14                assaulted another of her male friends."

15  (Id. at 20; see also Pet., Ex. 2 at consecutive p. 3.)  Petitioner argues that these events "were

16  never charged nor reliably established."  (P&A at 20.)  He explains that he did not "break into"

17  Mr. Snyder's garage because the door was open, and he did not steal the tires because he "owned

18  both the car and the tires he removed from the car."  (Id.)  Petitioner further explains that he did

19  not "break into" Ms. Mayfield's home because the home was actually "owned by petitioner's

20  brother."  (Id.)  Petitioner concedes that he "admitted portions of [these] uncharged events," but

21  he argues that the allegations were "stated out of context by the Governor" and present a

22  misleading picture of petitioner's actions.  (Id. at 20-21.)

23           Fourth, petitioner contends that the Governor misapplied or ignored statutory

24  factors in favor of suitability when issuing his decision.  (Id. at 21-30.)  Specifically, petitioner

25  argues that the Governor glossed over and/or misinterpreted the positive psychological reports in

26  favor of his release; improperly relied on petitioner's prior substance abuse as a factor weighing

1  against suitability; and was in error when he stated that petitioner had not assumed full

2  responsibility for the crime.  Petitioner also argues that the Governor "misapplied" suitability

3  factors.  (Id. at 26.)  Specifically, he argues that the Governor improperly: (1) minimized the fact

4  that petitioner did not have a juvenile record by inserting into the discussion of this factor

5  petitioner's under-age drinking and drug use and his adult substance abuse history; (2) used the

6  unproven charges discussed above to conclude that petitioner has an unstable social history

7  when, in fact, petitioner "continues to enjoy good relationships" with persons other than his

8  former wife; (3) questioned the sincerity of petitioner's expressions of remorse when all available

9  evidence suggests that petitioner's remorse is genuine; (4) appears to believe, despite the jury's

10 verdict, that petitioner was convicted of first degree premeditated murder; (5) minimized the fact

11 that petitioner had no prior convictions for violent crimes by stating that petitioner "lacks a

12 significant criminal record . . . only by his luck or evasiveness;" (6) overlooked the fact that

13 petitioner was 45 years old at the time of the 2002 hearing and has "matured tremendously in

14 terms of emotional stability, insight and self-control;" (7) failed to consider petitioner's

15 "numerous self-help, educational, vocational, and behavioral accomplishments;" (8) made no

16 mention of petitioner's stable parole plans; and (9) "gave only glossing consideration" to the fact

17 that petitioner has never received a prison disciplinary conviction and has maintained "0 points

18 for seven years."  (Id. at 26-30.)

19         Finally, citing the decision in Biggs v. Ternune, 334 F.3d 910 (9th Cir. 2003),

20 petitioner argues that the Governor's use of the unchanging factor of his crime of conviction to

21 deny him a parole date violated his right to due process.  (Id. at 30-31.)  In sum, petitioner argues

22 that there was no valid evidence to support the Governor's decision to deny parole to this

23 "rehabilitated model prisoner who has obtained four (4) vocations in prison."  (Id. at 32.)

24         B.  Applicable Law

25         The Due Process Clause of the Fourteenth Amendment prohibits state action that

26 deprives a person of life, liberty, or property without due process of law.  A person alleging due

14

1   process violations must first demonstrate that he or she was deprived of a liberty or property

2   interest protected by the Due Process Clause and then show that the procedures attendant upon

3   the deprivation were not constitutionally sufficient.  Kentucky Dep't of Corrections v.

4   Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir.

5   2002).

6            A protected liberty interest may arise from either the Due Process Clause of the

7   United States Constitution or state laws.  Board of Pardons v. Allen, 482 U.S. 369, 373 (1987).

8   The United States Constitution does not, of its own force, create a protected liberty interest in a

9   parole date, even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).

10  However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that

11  parole release will be granted' when or unless certain designated findings are made, and thereby

12  gives rise to a constitutional liberty interest."  McQuillion, 306 F.3d at 901 (quoting Greenholtz

13  v. Inmates of Nebraska Penal, 442 U.S. 1, 12 (1979)).  In this regard, it is clearly established that

14  California's parole scheme gives rise to a cognizable liberty interest in release on parole even for

15  prisoners who have not already been granted a parole date.  Hayward v. Marshall, 512 F.3d 536,

16  542 (9th Cir. 2008); Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006);

17  Biggs, 334 F.3d at 914; McQuillion, 306 F.3d at 903.  Accordingly, this court must examine

18  whether the deprivation of petitioner's liberty interest in this case violated due process.

19           Because "parole-related decisions are not part of the criminal prosecution, the full

20  panoply of rights due a defendant in such a proceeding is not constitutionally mandated."

21  Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987) (internal quotations and

22  citation omitted).  Where, as here, parole statutes give rise to a protected liberty interest, due

23  process is satisfied in the context of a hearing to set a parole date where a prisoner is afforded

24  notice of the hearing, an opportunity to be heard and, if parole is denied, a statement of the

25  reasons for the denial.  Id. at 1390 (quoting Greenholtz, 442 U.S. at 16).  See also Morrissey v.

26  Brewer, 408 U.S. 471, 481 (1972) (describing the procedural process due in cases involving

15

1   parole issues).  Violation of state mandated procedures will constitute a due process violation

2   only if the violation causes a fundamentally unfair result.  Estelle, 502 U.S. at 65.

3          In California, the setting of a parole date for a state prisoner is conditioned on a

4   finding of suitability.  Cal. Penal Code § 3041; Cal. Code Regs. tit. 15, §§ 2401 & 2402.  The

5   requirements of due process in the parole suitability setting are satisfied "if some evidence

6   supports the decision."  McQuillion, 306 F.3d at 904 (citing Superintendent v. Hill, 472 U.S.

7   445, 456 (1985)); Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994) (citing Perveler v. Estelle,

8   974 F.2d 1132, 1134 (9th Cir. 1992)).  It is this "some evidence" standard that lies at the heart of

9   petitioner's claims in this case.  For purposes of review under AEDPA, Hill's "some evidence"

10  standard is "clearly established" federal law.  See Hayward, 512 F.3d at 542; Irons v. Carey, 505

11  F.3d 846, 851 (9th Cir. 2007); Sass, 461 F.3d at 1129 (citing Hill, 472 U.S. at 456).  "The 'some

12  evidence' standard is minimally stringent," and a decision will be upheld if there is any evidence

13  in the record that could support the conclusion reached by the fact-finder.  Powell, 33 F.3d at 40

14  (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987)); Toussaint v. McCarthy, 801 F.2d

15  1080, 1105 (9th Cir. 1986).  However, "the evidence underlying the [ ] decision must have some

16  indicia of reliability."  Jancsek, 833 F.2d at 1390.  See also Perveler, 974 F.2d at 1134.

17  Determining whether the "some evidence" standard is satisfied does not require examination of

18  the entire record, independent assessment of the credibility of witnesses, or the weighing of

19  evidence.  Toussaint, 801 F.2d at 1105.  The question is whether there is any reliable evidence in

20  the record that could support the conclusion reached.  Id.

21          In recent years the Ninth Circuit Court of Appeals has been called upon to address

22  the issues presented here in four significant cases, each of which will be discussed below.  First,

23  in Biggs the Ninth Circuit recognized that a continued reliance on an unchanging factor such as

24  the circumstances of the offense in denying parole could, at some point, result in a due process

25  violation. 334 F.3d at 916-17.  That holding has been acknowledged as representing the law of

26  the circuit.  Irons, 505 F.3d at 853; Sass, 461 F.3d at 1129; see also Hayward, 512 F.3d at 545.

16

While the court in <u>Biggs</u> rejected several of the reasons given by the Parole Board for finding the petitioner unsuitable for parole, it upheld three:  (1) petitioner's commitment offense involved the murder of a witness; (2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; and (3) petitioner could benefit from therapy.  <u>Biggs</u>, 334 F.3d at 913.  However, the court cautioned that continued reliance solely upon the gravity of the offense of conviction and petitioner's conduct prior to that offense in denying parole could violate due process.  In this regard, the court observed:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law.  Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest in parole.

<u>Id.</u> at 916.  The court also stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." <u>Id.</u> at 917.

In <u>Sass</u>, the Parole Board had found the petitioner unsuitable for parole at his third suitability hearing based on the gravity of his offenses of conviction in combination with his prior offenses.  461 F.3d at 1126.  Relying on the decision in <u>Biggs</u>, the petitioner in <u>Sass</u> contended that reliance on these unchanging factors violated his right to due process.  The court disagreed, concluding that in the case before it these factors amounted to "some evidence" to support the Board's determination.  <u>Id.</u> at 1129.  The court explained its holding as follows:

> While upholding an unsuitability determination based on these same factors, we previously acknowledged that "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." <u>Biggs</u>, 334 F.3d at 917 (emphasis added).  Under AEDPA it is not our function to speculate about

17

how future parole hearings could proceed.  Cf. id.  The evidence of
Sass' prior offenses and the gravity of his convicted offenses
constitute some evidence to support the Board's decision.
Consequently, the state court decisions upholding the denials were
neither contrary to, nor did they involve an unreasonable
application of, clearly established Federal law as determined by the
Supreme Court of the United States.  28 U.S.C. § 2254(d).

461 F.3d at 1129.

Subsequently, in Irons the Ninth Circuit sought to harmonize the holdings in

Biggs and Sass, stating as follows:

Because the murder Sass committed was less callous and cruel than
the one committed by Irons, and because Sass was likewise denied
parole in spite of exemplary conduct in prison and evidence of
rehabilitation, our decision in Sass precludes us from accepting
Iron's due process argument or otherwise affirming the district
court's grant of relief.

We note that in all the cases in which we have held that a parole
board's decision to deem a prisoner unsuitable for parole solely on
the basis of his commitment offense comports with due process, the
decision was made before the inmate had served the minimum
number of years required by his sentence. Specifically, in Biggs,
Sass, and here, the petitioners had not served the minimum number
of years to which they had been sentenced at the time of the
challenged parole denial by the Board. Biggs, 334 F.3d at 912;
Sass, 461 F.3d 1125. All we held in those cases and all we hold
today, therefore, is that, given the particular circumstances of the
offenses in these cases, due process was not violated when these
prisoners were deemed unsuitable for parole prior to the expiration
of their minimum terms.

Furthermore, we note that in Sass and in the case before us there
was substantial evidence in the record demonstrating rehabilitation.
In both cases, the California Board of Prison Terms appeared to
give little or no weight to this evidence in reaching its conclusion
that Sass and Irons presently constituted a danger to society and
thus were unsuitable for parole. We hope that the Board will come
to recognize that in some cases, indefinite detention based solely
on an inmate's commitment offense, regardless of the extent of his
rehabilitation, will at some point violate due process, given the
liberty interest in parole that flows from the relevant California
statutes. Biggs, 334 F.3d at 917.

Irons, 505 F.3d at 853-54.

/////

18

1       Finally, and most recently, in <u>Hayward</u>, the Ninth Circuit determined that under

2   the circumstances of that case the unchanging factor of the gravity of the commitment offense did

3   not constitute "some evidence" supporting the Governor's decision to reverse a parole grant on

4   the basis that the petitioner's release would pose a continuing danger to society.  <u>Hayward</u>, 512

5   F.3d at 546.  The circumstances relied upon by the court to reach this conclusion in <u>Hayward</u>

6   were the following: (1) the petitioner had served twenty-seven years in prison on a sentence of

7   fifteen years to life; (2) the petitioner was sixty-four years old; (3) after eleven parole suitability

8   hearings, the Board had twice recommended that the petitioner receive a parole date; (4) former

9   California Governor Gray Davis reversed the Board's second grant of parole based on seven

10  factors, four of which were unsupported by the record and three of which were based on

11  unchanging circumstances; (5) the provocation for petitioner's crime was the attempted rape of

12  his girlfriend (and future wife) by the victim; (6) the petitioner had solid parole plans, including

13  several offers of employment and a place to live; and (7) the petitioner had an "exemplary"

14  prison record for most of his period of incarceration, with his last major disciplinary violation

15  taking place in 1989 and with only a minor disciplinary infraction in 1997.  <u>Id.</u>  Against this

16  background the Ninth Circuit explained:

17              In light of the extraordinary circumstances of this case – given the
                provocation for Hayward's violent crime in 1978, his incarceration
18              for almost thirty years with his positive prison record in recent
                times, and the favorable discretionary decisions of the Board in
19              successive hearings, which were reversed by the Governor on
                factual premises most of which were not documented in the record
20              – we conclude that the unchanging factor of the gravity of
                Hayward's commitment offense had no predictive value regarding
21              his suitability for parole.  In the circumstances of this case, the
                Governor violated Hayward's due process rights by relying on that
22              stale and static factor in reversing his parole grant.

23  <u>Hayward</u>, 512 F.3d at 546.

24      After taking into consideration the Ninth Circuit decisions in <u>Biggs</u>, <u>Sass</u>, <u>Irons</u>,

25  and <u>Hayward</u>, and for the reasons set forth below, this court concludes that here petitioner is not

26  /////

1  entitled to federal habeas relief with respect to his challenge to then-Governor Davis's reversal of

2  the Board's 2002 decision finding him suitable for parole.

3      C.  Discussion

4          The issue before this court is whether the decision of the California Supreme

5  Court upholding the former governor's reversal of the Board's 2002 decision finding petitioner

6  suitable for parole is contrary to or an unreasonable application of federal law.  28 U.S.C. §

7  2254(d).[1]  Under California law, the Governor must consider the same factors the Board is

8  required to consider in deciding whether to reverse a grant of parole.  Hayward, 512 F.3d at 542.

9  Specifically, under California Penal Code § 3041(a), "a life prisoner shall be found unsuitable for

10 parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to

11 society if released from prison."  In reviewing this regulation, the Ninth Circuit has observed:

12
13
14
15
> "[t]he test is not whether some evidence supports the reasons the
> Governor cites for denying parole, but whether some evidence
> indicates a parolee's release unreasonably endangers public safety.
> Some evidence of the existence of a particular factor does not
> necessarily equate to some evidence the parolee's release
> unreasonably endangers the public safety."

16 Hayward, 512 F.3d at 543 (quoting In re Lee, 143 Cal. App. 4th 1400, 1408 (2006)).  See also

17 Jancsek, 833 F.2d at 1390 (due process is satisfied if some evidence supports the decision).

18         Pursuant to § 2281(a) of Title 15 of the California Code of Regulations,

19
20
21
> [t]he panel or board shall set a release date unless it determines that
> the gravity of the current convicted offense or offenses, or the
> timing and gravity of current or past convicted offense or offenses,
> is such that consideration of the public safety requires a more

22 /////

23

24  [1]  As a preliminary matter, the court notes that Governor Davis's letter was, essentially, a
25  rejection of the California Superior Court's December 21, 2001 decision directing the Board to
    find petitioner suitable for parole.  The Governor's letter did not address the Board's April 2,
    2002 written decision granting petitioner a parole date, which was issued under compulsion of
26  the Superior Court's order.  Rather, the Governor directed his arguments to the findings and
    reasoning of the California Superior Court in its December 21, 2001 order.

1
> lengthy period of incarceration for this individual, and that a parole
2
> date, therefore, cannot be fixed at this meeting.

3  Cal. Penal Code § 3041(b).

4       The state regulation that governs parole suitability for life prisoners states as

5  follows with regard to the statutory requirement of California Penal Code § 3041(b):

6  "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied

7  parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to

8  society if released from prison."  Cal. Code Regs. tit. 15, § 2281(a).  The same regulation

9  requires the Board to consider all relevant, reliable information available regarding

10
11
12
13
14
> the circumstances of the prisoner's social history; past and present
> mental state; past criminal history, including involvement in other
> criminal misconduct which is reliably documented; the base and
> other commitment offenses, including behavior before, during and
> after the crime; past and present attitude toward the crime; any
> conditions of treatment or control, including the use of special
> conditions under which the prisoner may safely be released to the
> community; and any other information which bears on the
> prisoner's suitability for release.

15  Cal. Code Regs. tit. 15, § 2281(b).

16       The regulation identifies circumstances that tend to show suitability or

17  unsuitability for release.  Id., § 2281(c) & (d).  The following circumstances tend to show that a

18  prisoner is suitable for release: the prisoner has no juvenile record of assaulting others or

19  committing crimes with a potential of personal harm to victims; the prisoner has experienced

20  reasonably stable relationships with others; the prisoner has performed acts that tend to indicate

21  the presence of remorse or has given indications that he understands the nature and magnitude of

22  his offense; the prisoner committed his crime as the result of significant stress in his life; the

23  prisoner's criminal behavior resulted from having been victimized by battered women syndrome;

24  the prisoner lacks a significant history of violent crime; the prisoner's present age reduces the

25  probability of recidivism; the prisoner has made realistic plans for release or has developed

26  /////

1  marketable skills that can be put to use upon release; institutional activities indicate an enhanced

2  ability to function within the law upon release.  Id., § 2281(d).

3            The following circumstances tend to indicate unsuitability for release: the prisoner

4  committed the offense in an especially heinous, atrocious, or cruel manner; the prisoner had a

5  previous record of violence; the prisoner has an unstable social history; the prisoner's crime was

6  a sadistic sexual offense; the prisoner had a lengthy history of severe mental problems related to

7  the offense; the prisoner has engaged in serious misconduct in prison.  Id., § 2281(c).  Factors to

8  consider in deciding whether the prisoner's offense was committed in an especially heinous,

9  atrocious, or cruel manner include: multiple victims were attacked, injured, or killed in the same

10  or separate incidents; the offense was carried out in a dispassionate and calculated manner, such

11  as an execution-style murder; the victim was abused, defiled or mutilated during or after the

12  offense; the offense was carried out in a manner that demonstrated an exceptionally callous

13  disregard for human suffering; the motive for the crime is inexplicable or very trivial in relation

14  to the offense.  Cal. Code Regs., tit. 15, § 2281(c)(1)(A) - (E).  Under current California law, the

15  Board is apparently not required to refer to sentencing matrixes or compare the prisoner's crime

16  to other crimes of the same type in deciding whether the crime was especially cruel or

17  exceptionally callous but may find the crime especially cruel or exceptionally callous if there was

18  violence or viciousness beyond what was "minimally necessary" for a conviction.  In re

19  Dannenberg, 34 Cal. 4th 1061, 1095 (2005).

20            After thorough review, this court cannot say that the Governor's August 30, 2002

21  decision is "so devoid of evidence that the findings of the [Governor] were without support or

22  otherwise arbitrary."  Hill, 472 U.S. at 457.  First, and perhaps most importantly, at the time of

23  the Governor's August 30, 2002 decision, petitioner had not yet served the minimum number of

24  /////

25  /////

26  /////

22

1   years required by his sentence.[2]  Petitioner's right to due process was not violated when he was

2   deemed unsuitable for parole on this record prior to the expiration of his minimum term.  Irons,

3   505 F.3d at 665.  Rather, the facts in this case are similar in many respects to those in Sass,

4   where the petitioner was found unsuitable for parole at his third suitability hearing based on the

5   commitment offense and the petitioner's prior criminal history.  As discussed above, the Ninth

6   Circuit concluded that these factors amounted to "some evidence" to support the Board's

7   determination in the context of a petitioner who had not yet served his minimum term of

8   imprisonment.  Sass, 469 F.3d at 1129.

9          Petitioner objects to the description of his crime of conviction contained in the

10  Governor's August 30, 2002 decision.  Specifically, petitioner (1) denies that Ms. Mayfield was

11  in her home or residence at the time of the murder because the home was owned by petitioner's

12  brother; (2) states that he did not intentionally back into the victim's car at the scene, but

13  accidentally backed into his car once and then intentionally "made contact bumper to bumper;"

14  (3) states that he did not load the pistol at his home prior to the shooting; rather, the pistol was

15  already loaded; (4) states that he knocked on Ms. Mayfield's door prior to entering; (5) states that

16  he jumped on the victim only after he observed him making a move to get his handgun; (6) states

17  that he fired on the victim only after the victim "succeeded in obtaining his gun and pointed it at

18  Mr. Mayfield;" and (7) denies that he said to the victim, "How would you like to get shot."

19  (P&A at 3-6.)  After a review of the record, this court concludes that the nature of petitioner's

20  crime of conviction, even as described by petitioner, is sufficiently grave to support the

21  Governor's finding that consideration of the public safety required a more lengthy period of

22  incarceration.

23  /////

24

25         [2]  As noted above, petitioner was sentenced on December 20, 1985 to 17 years to life in
26  prison.  Thus, the Governor's decision reversing the parole grant was dated approximately four
    months prior to petitioner's service of his minimum term of seventeen years.

1     Petitioner also objects to other aspects of the former Governor's decision.  For

2  instance, he denies that he assaulted his former girlfriend in 1983, that he pointed a loaded gun at

3  his roommate, Mr. Telemchuck, that he stalked or attacked Ms. Mayfield, or that he was "out to

4  get" the victim.  (Id. at 7-9.)  He argues that the Governor's reliance on these events to deny him

5  parole was erroneous because, while petitioner admits "portions of the allegations," he does not

6  admit the allegations "to the extent stated by the Governor."  (Id. at 9.)  This court does not have

7  sufficient evidence before it to conclude that the Governor's factual findings in this regard were

8  false or that his reliance, in part, on these past alleged incidents to support his decision violated

9  petitioner's right to due process.

10     Nonetheless, the court notes that some of the factors present in Hayward are also

11  present in this case.  For instance, in both cases the former Governor reversed the Board's grant

12  of parole based on several factors which were based on unchanging circumstances.  Further, here,

13  as in Hayward, the petitioner has solid parole plans, including several offers of employment and a

14  place to live, and has an exemplary prison record.  However, there are also significant differences

15  between this case and Hayward.  The petitioner in Hayward was found suitable for parole twice

16  by the Board and had both of those parole grants reversed by former Governor Davis.  512 F.3d

17  at 539-40.  In addition, the petitioner in Hayward had received eleven suitability hearings before

18  having the Board's granting of parole reversed by the Governor for the second time.  Id.  In

19  contrast, the petitioner in this case has never been found suitable for parole voluntarily by the

20  Parole Board.  In addition, petitioner received only three suitability hearings, one of which was

21  compelled by court order, before the Superior Court ordered the Board to grant him a parole date.

22  Finally, and most importantly as noted above, the petitioner in this case had not yet served his

23  minimum 17 year sentence at the time of the Governor's decision.  In contrast, at the time of the

24  Ninth Circuit decision the petitioner in Hayward had already served twenty-seven years in prison

25  on a sentence of fifteen years to life.

26  /////

CONCLUSION

Based on the authorities cited above, this court concludes that former Governor Davis's August 2002 reversal of the decision by the Board finding petitioner suitable for parole was supported by "some evidence" bearing "indicia of reliability" that petitioner's release would threaten public safety.  At the time of the former Governor's decision in 2002 this case had not yet reached the point where a continued reliance on an unchanging factor, such as the circumstances of the offense, in denying parole resulted in a due process violation.  Therefore, the state court decision denying petitioner habeas relief on his due process claim is not contrary to or an unreasonable application of federal law and should not be set aside.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 8, 2008.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8
mayfield1182.hc

25